IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

KATHERINE RUTAN POLLARD, )
                                        )
                    Petitioner,         )
v.                                      )      Case No. CIV-10-494-HE
                                        )
MILLICENT NEWTON-EMBRY, WARDEN, )
                                        )
                    Respondent.         )

## REPORT AND RECOMMENDATION

Petitioner, Katherine Rutan Pollard, appearing *pro se*, has filed a petition for habeas

corpus relief pursuant to 28 U.S.C. § 2254 [Doc. #1] challenging the constitutionality of her

state court conviction.  Respondent has filed a response [Doc. #10].  Petitioner has been

given the opportunity to file a reply, *see* Order [Doc. #12], but has failed to do so.  The

matter is now at issue.  For the reasons set forth below, it is recommended that the petition

be denied.

## I.    Procedural History

Petitioner was convicted, after jury trial, of Murder in the First Degree, Case No. CF-

2006-31, in the District Court of Woods County,[1] State of Oklahoma. Petitioner received a

sentence of life imprisonment without the possibility of parole.

---

[1]The charging document in this case was filed in Woodward County.  Due to extensive pre-
trial publicity, however, a change of venue was granted, and the trial was conducted in Woods
County.

Petitioner appealed her conviction to the Oklahoma Court of Criminal Appeals (OCCA). In a published opinion, the OCCA affirmed Petitioner's conviction. *See Rutan v. State*, 202 P.3d 839 (Okla. Crim. App. 2009); *see also* Response, Exhibit 3, copy of opinion.

## II.  <u>Factual Background</u>

In its decision on direct appeal, the OCCA provided a thorough and detailed account of the relevant facts leading to Petitioner's arrest and eventual conviction. The OCCA's summary of the evidence at trial is repeated here, verbatim, as relevant to Petitioner's grounds for federal habeas relief, and in particular, her challenge to the sufficiency of the evidence raised in Ground One of the Petition.

> ¶ 2 Appellant and her two young sons, 6 year old Logan Tucker and 4 year old J.D., shared a home with Melody Lennington in Woodward, Oklahoma. At approximately 3:00 a.m., Sunday, June 23, 2002, Ms. Lennington was awakened by a scream. She recognized the voice as that of Logan. Thinking he was having another nightmare, she w[e]nt back to sleep. A short time later, she got out of bed to find Appellant in the front room at the computer. Lennington asked if Logan was okay. Appellant said he was sick so she had put him in a back bedroom. Lennington returned to bed and woke up again at 6:00 a.m. to get ready for work. Appellant was still sitting at the computer. Lennington again asked if Logan was okay. She told Appellant she needed to get her work clothes from the back bedroom and didn't want to disturb Logan. Appellant told her, "[d]on't worry about it. He's in the basement." The basement was solid cement with cinder blocks and contained the hot water heater, an old cabinet, and an old soiled twin mattress on a set of springs. No place for a sick child, thought Lennington. Although upset that Logan was in the basement, Lennington got ready and left for work.
>
> ¶ 3 The scream was the last anyone heard from Logan Tucker. Appellant had long seen Logan as an obstacle that stood between her and the life she wanted to live. Paul Mullins, a former boyfriend who lived with Appellant in 1999, frequently observed Appellant hit Logan with enough force to knock him to the ground. Appellant told Mullins she felt trapped and asked him several

times when she would be able to start enjoying her life. Arriving home from work one night, he observed that Logan "had been beaten and beaten severely."

¶ 4 Brady Gougler, Appellant's third husband to whom she was married from 1999 to 2001, observed Appellant yell at the children frequently and spend time at the computer instead of with them. In August 2001, Appellant told her neighbors in Nowata, Oklahoma, the Randells, that she could not stand Logan and that she felt he was a mistake that stood in the way of what she could accomplish, that he was the reason her relationships failed and she did not know what she might do to him. The Randells noticed that Appellant's relationship with Logan was different from that with J.D. While J.D. received her attention and compassion, Logan was pushed aside and ignored. The Randell's fifteen year old daughter, Ashlee, observed Appellant discipline the boys and felt her discipline of Logan was excessive. She said Appellant repeatedly spanked Logan with a belt and plastic coat hangers.

¶ 5 Having separated from Gougler, Appellant moved in with Richard Cody later that year. They had met at their children's day care center. One evening, Appellant and her sons, and Cody and his daughter went for a drive. Appellant and Logan screamed at each other most of the ride. At one point, Appellant told Cody to stop the truck. She took Logan out of the truck, left him on the side of the road, and told Cody to drive off and leave him there. Cody drove a few feet before stopping and putting Logan back in the truck.

¶ 6 During the relationship, Appellant told Cody that her brother had offered her a job out of state, but that she would not be able to bring her children because her brother did not like children. One night Cody and Appellant were in bed talking. Appellant told Cody she wished there was some way she could kill her kids and get away with it. Not believing what he heard, Cody replied, "excuse me." Appellant repeated what she had said, but then said she was only kidding. Cody was so disturbed by what he heard that he left his bed and slept the night in his daughter's bed. With the help of a crisis center, Cody got Appellant out of his house within three to four days.

¶ 7 Kevin Caudill met Appellant in March 2002 and though they dated only a couple of months, they remained friends. One night, Appellant phoned Caudill, upset. She said that most people look forward to the weekend to spend time with their children, but her children were the very reason she dreaded the weekend.

¶ 8 On April 27, 2002, Tulsa police officers responded to a call to check the well-being of a child. Appellant told the officers she was afraid she was going to hurt her children, did not want to be around them, and that Logan "made her so angry that she just wanted to hit him as hard as she could." The officers took both boys into protective custody and transported them to a shelter.

¶ 9 Michelle Christy interviewed Appellant regarding the April 27 incident for the Department of Human Services (DHS). Appellant told her she felt "very overwhelmed" by Logan and she was often angry at him and yelled at him frequently. Appellant wanted her parents, the Cathcarts, to take Logan. However, despite helping Appellant with the children in the past, Mr. and Mrs. Cathcart, who lived in Florida, were unable to take Logan at that time.

¶ 10 After a hearing, the children were returned to Appellant on May 2, 2002. About this time Appellant met Michael Pettey through personal ads she had posted on the internet. On the day her children were returned to her, she told Pettey in an e-mail that Logan would not be coming home.

¶ 11 By the middle of May, Appellant and Pettey were discussing the idea of Appellant moving from her home in Tulsa to Fort Supply, where Pettey lived. While Pettey wanted Appellant to move to the area, he expressed reservations about actually living with her. Appellant had other ideas. On May 23, she informed Pettey that she had been fired from her job and she and the boys were moving to Fort Supply. Appellant and the children lived with Pettey for two weeks. Not ready for that type of relationship, Pettey looked for another place for Appellant to live.

¶ 12 Pettey made arrangements for Appellant and her children to move in with his co-worker, Melody Lennington. Appellant and her children moved into Lennington's home on June 10, 2002. Appellant spoke poorly of Logan in Lennington's presence as well as Logan's. She blamed him for trying to burn down their home in Tulsa. On June 19, 2002, Lennington smelled sulphur in her house and found Logan with cigarettes and J.D. with a lighter. Lennington called the police. When they arrived, Appellant told them Logan was trying to burn down Lennington's house and she wanted him arrested. The officer did not take Logan into custody, but called Jimmie Fraley, a mental health worker, to the scene.

¶ 13 Appellant later told Pettey she found Logan with matches trying to burn down Lennington's house. Feeling responsible for Appellant living with

Lennington, and having previously been told by Appellant that Logan had tried to burn down their Tulsa home, Pettey told her he wanted her out of Lennington's home. He told her he did not want her at his house, his mother's house, or at the house of anyone else he knew, because he did not want Logan to burn anything down.

¶ 14 On that day and the next, June 20, 2002, Appellant spoke to three different people, Aubrey Mabrey of the Northwest Domestic Crisis Services, Jimmie Fraley of the Mental Health Center in Woodward, and RaGenia Ives of DHS, in an attempt to send Logan away immediately, either by sending him to a hospital, to a shelter, or relinquishing her parental rights. Appellant told Aubrey Mabrey that Logan hid some lighters from her and that he stabbed J.D. She said that Logan finally showed her where the lighters were, but the lady she was living with told her she had to find another place to live. Appellant also told Mabrey she had called DHS and spoken with RaGenia Ives who told her DHS had closed her case and they could not help her. Appellant further said that both she and her boyfriend were scared of Logan and that the youth shelter would not take him.

¶ 15 Appellant told Jimmie Fraley she wanted Logan placed in inpatient psychiatric care at a hospital. Fraley called Meadowlake Hospital, a psychiatric hospital for children, and was told there was no room available immediately, but if they could wait a few days, there would be space by Monday, June 24. Fraley went ahead and made an appointment for Logan for Monday morning. Appellant was extremely upset when she learned Logan could not be admitted that day. She told Fraley he was dangerous and needed to be placed immediately. During the interview, Fraley observed Logan to be a "normal little boy," well-mannered and friendly. However, Appellant appeared to be angry with Logan, impatient and very strict with him. When Appellant left Fraley's office, she shouted, "[y]ou people never listen to me. He's a child murderer and a house burner, and you won't do anything."

¶ 16 RaGenia Ives visited Appellant at Lennington's home. Appellant spent most of the time telling Ives about Logan's bad behavior. She said Logan was affecting her relationship with her boyfriend and she was afraid he would leave her because of Logan. Appellant told Ives they were waiting for space to open up at Meadowlake Hospital. Ives observed Logan to be healthy, clean and appropriately dressed. When Ives first arrived, Logan asked her if she was there to take him away.

¶ 17 Around this time, Appellant became fixated on an accident that had occurred Memorial Day Weekend in which a bridge on I-40 had collapsed over a river. Appellant repeatedly talked to Debra Lenning, Pettey's sister, about the fact that people drove off the bridge and were never seen again, that they "just disappear[ed] into thin air." On Friday, June 21, 2002, Appellant was upset that she could not attend a motorcycle rally that weekend with Pettey. She told Lennington she could not find anyone to stay with her children, particularly Logan.

¶ 18 On June 23, and the days thereafter, Appellant told several different stories to explain Logan's absence. Around noon on the 23rd, Lacie Lennington arrived to visit her mother. When asked where the boys were, Appellant, who was playing cards on the computer, replied that DHS had just picked up Logan. Having previously been told by Appellant that if DHS took one boy they would take the other, Lacie asked if both boys had been taken. Appellant replied that only Logan had been taken. Appellant did not seem to be upset over the matter.

¶ 19 That afternoon, Appellant met Pettey at the home of Dee Kirby. Appellant told them she was upset because DHS had picked up Logan. Appellant said she was treating the situation the same as when her infant daughter, Logan's twin, passed away at birth.[FN2] She said she was going to look at it as if Logan was dead because that was the way she could cope with it. She added that Logan wasn't dead, but she was going to treat it like he was. Appellant also talked to Jim Stinnett and Evelyn Pettey that day. She told Stinnett, her next door neighbor, that DHS had taken Logan earlier that day. She told Ms. Pettey, Michael Pettey's mother, that DHS had taken Logan and she would not see him again until he was 18 years old. Ms. Pettey thought it was odd that DHS would pick up a child on a Sunday morning. Based upon a comment from J.D., Ms. Pettey observed a "goopy-looking" substance on the front of Appellant's shirt. Appellant explained she had spilled a candle on herself. Ms. Pettey also noticed that Appellant kept scratching her arms and legs. Appellant explained that she and J.D. had been out walking in the brush and it made her itch.

> FN2. Appellant's father testified that he was present at Logan's birth and that Logan was a single birth, there was no twin.

¶ 20 At approximately 4:00 p.m. that day, Lennington's other daughter, Christy Vaughn, went to check on her mother. When she arrived at the house,

she found no sign of Logan. Finding Appellant in the kitchen, Vaughn began a conversation. Appellant started to cry and told Vaughn that DHS had taken Logan. Appellant said it "felt like a stress was lifted off" of her, that "the weight was lifted off." Appellant then tried to give Vaughn some of Logan's clothes. When asked where she thought Logan would end up, Appellant said she thought the "real father" would have him. At the time, Ms. Vaughn worked for the Woodward County Police Department as a police dispatcher. In that capacity, she had not received any information that DHS was to pick up Logan.

¶ 21 Later that day, Ms. Lennington returned home to find Appellant next door at Pam Chambers' home. Appellant told the women that DHS had picked up Logan and showed them a bruise on her arm claiming it had been caused by Logan. Appellant explained that DHS was going to give Logan to his natural father. Appellant tried to give Chambers Logan's clothes and toys for her grandchildren explaining that DHS would not let him have those things. Chambers refused to accept the items.

¶ 22 That evening, Michael Pettey arrived at Appellant's house per her request to talk. He found her dressed up as if ready for a date. He said she did not seem sad and did not mention Logan. The couple went to Phillip Burkhalter's home to look at pictures from a motorcycle rally. During the evening, Appellant told Burkhalter that DHS had taken Logan that morning.

¶ 23 On Monday, June 24, Dannella Smith, with Meadowlake Hospital, phoned Appellant to tell her that a bed was available for Logan. Appellant told her she didn't need the space, that Logan was going to live with his uncle.

¶ 24 That same day, Appellant told Melody Lennington that she had seen some wildflowers that she thought would look pretty in Lennington's window box. Appellant told Lennington she was going to dig up the flowers and bring them back to the house and plant them. Later that day, Appellant borrowed a shovel from Pettey and some clear Visqueen plastic he was using to build a pond in his yard. Appellant never brought Lennington any wildflowers.

¶ 25 On June 25, Appellant spoke to Jennifer Winn with DHS about raising her food stamps. The day-care services for Logan and J.D. were also cancelled as Appellant was not working. Appellant explained that she was having problems with Logan and was trying to put him in some type of facility. She said he was currently in another town with his grandparents. Also on that day,

Appellant phoned her parents to tell them that DHS had taken Logan and her parental rights were going to be terminated. She told them Logan had been placed in a facility for disturbed children and he was not to be contacted.

¶ 26 On June 26, RaGenia Ives received a message from Meadowlake Hospital that the appointment for Logan Tucker had been cancelled. Ives called Appellant and asked what had happened. Appellant told her she had cancelled the appointment at Meadowlake because she had sent Logan to her brother in Vermont to go camping, and that afterwards she was going to place him at Brown's School in Tulsa.[FN3] Ms. Ives subsequently learned that no arrangements had been made for Logan to attend Brown's School.

> FN3. By the time of trial, Brown's School was known as Shadow Mountain Behavioral Health Center.

¶ 27 On June 26, Appellant enrolled J.D. in a child care center in Woodward. She told the director she had an older son who had been taken away the day before to a mental hospital and would not be returning. Appellant filled out the paperwork to enroll J.D., but never took him to the center.

¶ 28 The weekend of June 27, Appellant accompanied Pettey to a motorcycle rally. There she participated in a topless contest. Phillip Burkhalter, who was also at the rally, was told by Appellant that she had learned that Logan had been placed with his natural father. When asked if that was a good situation, Appellant replied that she didn't know, she had not seen Logan's father in several years. Sometime in late June, Appellant told Dee Kirby that Logan's natural father had him. By June 29, the Cathcarts had decided they could keep Logan and called DHS to check on him. They found he was not in DHS custody.

¶ 29 By late June and early July, 2002, Appellant's conflicting stories began to attract the attention of law enforcement. The media began running stories concerning Logan's disappearance. During this time, Appellant sought out people to make calls to appease the authorities and her parents, who she then knew were looking for Logan. Between July 5 and 7 she asked three different women to call her parents and tell them Logan was alright. On July 5, she asked Dee Kirby to phone her parents and let them know that Logan was okay. Having no idea where Logan was, Kirby refused. On July 6, Appellant told Kathy Link, whom she had met through Dee Kirby, that she was looking for someone to call her parents and let them know that Logan was okay. Appellant

explained to Link that Logan was with his biological father who had gone to court and gotten custody of him, and she did not want him taken from where he was. Link told Appellant it would be hard to find someone to make such a call without knowing the situation. On July 7, Appellant asked Fancie Hamilton, whom she had met through Pettey, to call her parents and tell them Logan was okay. Appellant told Hamilton that if her parents started asking questions to hang up. Not knowing where Logan was, Hamilton asked Appellant why she wanted to make the call. Appellant replied, "because everybody's wanting to know where [Logan's] at, and he's with his father in South Carolina." Appellant also told Hamilton to tell her parents that "any outside contact would not be advised" and "not to worry about him, he'd be fine." Hamilton did not make the phone call.

¶ 30 On July 7, Appellant also called Kevin Caudill, who she had not seen in a long time. She told him that her brother had taken Logan on a camping trip to either Pennsylvania or Vermont. When Caudill said that covered a big area and asked which state it was, Appellant couldn't remember. She then said that the Woodward County Sheriff's Department was looking for her son. She asked Caudill to call them, pretend to be her brother and say that Logan was with him camping. Caudill refused, telling Appellant to "give it a couple of days" to see if her brother called. On July 8, Appellant called Caudill on his cell phone and his home phone. Seeing her number on the phones, he didn't answer the call. Appellant left a message for Caudill to "call me" but Caudill did not return the call.

¶ 31 On July 7, Mickey Cathcart, Appellant's brother, called the Woodward authorities and asked them to check on the welfare of Logan and J.D. That same day, officers from the Woodward County Sheriff's Department arrived at Lennington's home. Observing them pull into the driveway, Lennington told Appellant of their arrival. Appellant got up from her chair, told Lennington to tell them she was not there and went to her bedroom. The officers informed Lennington they were there to speak to Appellant. Lennington told them she was there and called Appellant to talk with the officers. They told her they were there to do a welfare check on Logan. Appellant told the officers that Logan was with her brother, Brian Marquardt, on a camping trip in either Pennsylvania or Vermont. The officers asked for Marquardt's phone number, but Appellant did not have one. After the officers left, Lennington confronted Appellant about what she had told the officers. Appellant admitted she had lied to the officers but said nothing more.

¶ 32 On July 8, Appellant approached Don Hackley at a local gas station. Appellant and Hack[ley] had never met. Appellant, talking in a whisper, asked him to leave a message on an answering machine that Logan was okay. Appellant dialed the number and Hack[ley] left the following message, "[t]his is for Katie. And this is for her brother. She (sic) has Logan. He's all right, and they'll be back in a couple of weeks." A few days later, Hack[ley] heard on the radio that a little boy named Logan was missing. Remembering Appellant and the phone call, he contacted law enforcement.

¶ 33 The evening of July 8, Appellant phoned the sheriff's office to report she had received a message from her brother Brian on her answering machine. When the authorities arrived, Appellant played the message left by Hackley, but claimed the voice was that of her brother Brian. When asked how the authorities could contact Brian, Appellant said she did not have a phone number. However, the authorities already had a phone number for Brian and called it in Appellant's presence. They asked Brian Marquardt if he had Logan. He said he did not. Appellant claimed she told her brother not to tell anyone where Logan was. When Undersheriff Clem called Marquardt back he handed the phone to Appellant. Marquardt could be heard yelling at Appellant over the phone. When the undersheriff tried to take the phone from Appellant, she pulled it away. Undersheriff Clem asked Appellant to accompany him to the sheriff's office and Appellant agreed. During the ensuing interview, Clem told Appellant that by the next morning she needed to call her brother and get Logan back or file a kidnapping report. If she did not, the situation would be treated as a homicide. Appellant never filed a kidnapping report.

¶ 34 That same evening, Sergeant Barnett and Sheriff Morton returned to Lennington's home and searched everything except Appellant's bedroom. In the basement, they found an old bed without bedding, a pillow with no covering, wood shelves, and a white bucket on the floor. On the pillow, mattress, and floor directly beneath the bed was a substance which appeared to be orange candle wax. In the bucket was a wad of masking tape which contained clumps of whitish blond hair and a small blood stain, and more of the orange waxy substance. Subsequent DNA testing revealed that the hair and blood came from a male biological child of Appellant and Robert Tucker, Logan's biological father.

¶ 35 Appellant's car was also searched. Inside the trunk was found drain cleaner, rope, and an amount of plastic that was so large it could barely fit into

a three foot envelope. The heavy Visqueen plastic was the same type that Michael Pettey had on his property.

¶ 36 The Woodward County authorities registered Logan's disappearance with two national organizations, The National Center for Missing and Exploited Children and the Vanished Children Lights. Extensive searches, involving 300 to 400 volunteers and spanning numerous days were made in the areas surrounding Woodward and Fort Supply. Appellant never participated in any of the searches nor called the sheriff's office to check on the status of the searches.

¶ 37 On July 9, 2002, officers again searched Lennington's home, with her consent. As a result of this search, Lennington realized she was missing a blue suitcase that had belonged to her father. The last time she had seen the suitcase, it was in a closet in the back bedroom. Officers told Lennington what they believed happened to Logan. After the police left, Appellant pulled into the driveway and said to Lennington, "I suppose you want me to leave." Lennington said, "yes." Appellant gathered her things from the house and left. Sometime in July, Appellant had a conversation with Jamie Adams at a McDonald's restaurant. She told the young woman that she had one son who was four years old.

¶ 38 Further investigation revealed that Brian Marquardt never took Logan camping and had never had him in his custody. Marquardt, his sales company W.O.W. Industries, its employees and business travels were thoroughly investigated by state and federal authorities. It was established that on June 23, 2002, Marquardt and his employees were in Maryland and subsequently traveled to West Virginia. The evidence showed there was never a small child traveling with the company. FBI agents interviewed Robert Tucker, Logan's biological father, on July 12. Tucker said he had not seen Logan since he was an infant. Ronald Tucker, Robert's brother, was also interviewed. In 2002 he and his brother lived close to each other in North Carolina. By the time of trial, they lived together in South Carolina. He said that he had never seen Logan in his brother's custody.

¶ 39 In July 2002, authorities placed undercover officer Rick Stephens in an apartment across the hall from Appellant's apartment in Woodward. Over the next month, Appellant told Stephens that Logan was camping with her brother in Wisconsin. She later told him she believed in her heart he was dead. She said that her ex-boyfriend and the ex-boyfriend's roommate had taken Logan.

She admitted that she had made several phone calls to friends in areas outside of Woodward to please the police and say that they'd seen Logan. She told Stephens that "if law enforcement found out she had done it, she'd hung herself." Appellant also told Stephens that she felt like her attorney did not trust her, was secretly recording her, and believed she knew more about her son's disappearance than she was telling.

¶ 40 On August 9, 2002, Appellant was interviewed by FBI Agent Ronald Parrish. Appellant said that her brother Brian had agreed to take Logan and arrived at Melody Lennington's home on June 23 at approximately 11:00 a.m. or noon to pick him up. She said that three or four days later, her brother left a message on Lennington's phone telling her that Logan was all right and they were going camping the next day. She said before she could get Brian's phone number, he hung up.

¶ 41 On September 7, 2002, Appellant moved to Bartlesville, Oklahoma. Subsequently, Appellant and her husband visited in the Salzyn home as Mr. Salzyn and Appellant's husband worked together.[FN4] When the Salzyn's young son began fussing, Appellant commented to Laura Salzyn that "she remember [ed] those days." Not realizing that Appellant had any children, Mrs. Salzyn asked Appellant about her children. Appellant replied that she had a son that would have been nine and a son that was six. When asked what happened to the older son, Appellant replied that he had been, "killed by a drunk driver." Appellant explained that afterwards she was "a real mess" and she decided she should give up her parental rights to her other son and have him live with his father.

> FN4. The record does not indicate when Appellant married Mr. Pollard.

¶ 42 Appellant's younger son, J.D., was 9 years old at the time of trial. He testified that the last time he saw Logan, it was the afternoon and they were in the backseat of Appellant's car together. Logan was not talking or moving. J.D. said Appellant parked on a curve and carried Logan to a house. J.D. could not see if Appellant went into the house because of the trees. When Appellant returned to the car, Logan was not with her. As they drove off, J.D. saw a man looking through the window of the house. J.D. never saw Logan again.

¶ 43 Several interviews with J.D. were conducted by investigators and recorded in July and August, 2002. During an interview on July 9, J.D. told

investigators that Logan was with "my mom's brother." J.D. said he didn't know his uncle's name and he had not seen him. He said Logan was not coming back because he was bad. He told the investigators that Logan was sick when he went with his uncle, and that his uncle had picked Logan up from the doctor and taken him far away. He said that when Logan left he forgot to take his clothes and toys with him.

¶ 44 During an interview on July 15, J.D. told investigators that Appellant borrowed a shovel from Michael Pettey's house and they went digging for flowers. J.D. said Logan was with their uncle at the time. J.D. said when Appellant put the shovel in the trunk, she also put in plastic. When J.D. was asked what Appellant was doing when she went to dig, J.D. did not want to say because it kept "hurting [his] heart." J.D. led investigators to a spot where he told them, "Mama put her foot on the fence and got the shovel and went through the fence that way into the grassy area." As he said this, J.D. became despondent and wanted to leave the area. Authorities returned to the second area J.D. had led them and found a dig mark which appeared to have been made with a shovel in the ground which was very hard.

¶ 45 During an interview in August 2002, J.D. was asked why Appellant needed the shovel and the plastic. He said it was, "[t]o bury Logan." When asked what that meant, J.D. said it was to put dirt on Logan. However, he said he didn't see Appellant put any dirt on Logan. J.D. said that to keep Logan from crying, Appellant put tape over his eyes and mouth. However, before she put the tape over his mouth, she put food in it.

¶ 46 In another interview in August 2002, investigators took J.D. back to Lennington's home where he became "very agitated" when talking about Logan being in the back room. J.D. said that in the morning Appellant dressed Logan in the living room in the blue chair. He said Logan was sick and was not crying or talking. J.D. pointed out a desk in the living room where he said Appellant had gotten the tape. J.D. opened the desk and commented, "the tape's not here anymore." J.D. said Appellant carried Logan from the house to the car. He said Logan sat in the backseat with his head slumped over, that Logan was sick, he was not moving or crying and he was very white. When asked to explain about Logan being sick, J.D. indicated he didn't want to talk about it. When asked why, he said, "it hurts" and began crying. J.D. said that after Appellant drove around with him and Logan in the car, she found an old run down farm house where she stopped and left Logan.

¶ 47 Appellant was arrested and charged with Logan's murder in 2006. At that time, Mark Bell, a sanitation worker in Woodward, remembered something which occurred around the time of Logan's disappearance. Bell remembered that during his trash route on a Tuesday, he came across a suitcase located across the street from Ms. Lennington's residence. It was not in a place where Ms. Lennington usually placed her trash. The blue suitcase was bulky, wrapped in a clear, thick plastic, and tied with a rope. Bell thought the suitcase weighed anywhere from 40 to 60 pounds and that it smelled like a dead animal. Bell wanted to look inside the suitcase, but it would have taken a while to unwrap and untie it, and he needed the aid of a knife. Further, he noticed that he was being watched by a woman from across the street.

¶ 48 Based upon Bell's information, and Ms. Lennington's missing blue suitcase, the area landfill was searched. The landfill was used by several surrounding counties and by the time it was searched it contained 4 years worth of trash. Despite searching every day, all day, from March through July 2006, using a trackhoe type system and a core drilling machine, Logan's body was never found. Further facts will be set forth as necessary.

*Rutan*, 202 P. 3d at 841-848. In seeking federal habeas relief, Petitioner has not offered any challenge to the accuracy of the OCCA's statement of the evidence, either in the initial summary cited above or in the further recitation of facts included in the OCCA's opinion.

## III.    Grounds for Federal Habeas Corpus Relief

Petitioner raises the following grounds for federal habeas relief: (1) the evidence was insufficient to support the first degree murder conviction in violation of her federal constitutional due process rights; (2) Petitioner was denied the right to counsel of her choice in violation of the Sixth and Fourteenth Amendments to the United States Constitution; (3) the admission of other bad acts evidence violated Petitioner's federal due process rights; and (4) Petitioner was denied her Sixth Amendment right to the effective assistance of counsel

because trial counsel failed to object to the admission of other bad acts evidence or request a limiting instruction from the trial court.

Petitioner raised each of these grounds for relief on direct appeal of her conviction.[2] The OCCA thoroughly addressed each of the claims raised and affirmed the conviction.

## IV.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) standards of review apply to Petitioner's grounds for relief, adjudicated on the merits by the state courts. *See Turrentine v. Mullin*, 390 F.3d 1181, 1188 (10th Cir. 2004). Under AEDPA, this Court may grant Petitioner habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under this standard, judicial review is directed to the result of the state appellate court's decision, not its reasoning. *See Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state court's] decision unless we conclude that its result – not its rationale – is 'legally or factually unreasonable.'").

Whether the law is clearly established is a threshold inquiry. *See House v. Hatch*, 527 F.3d 1010, 1017-1018 (10th Cir. 2008), *cert denied*, 129 S.Ct. 1345 (2009). The absence of clearly established federal law is dispositive of the § 2254(d)(1) analysis. *Id.* at 1017. Thus, only if the court determines the law is clearly established does it proceed to determine

_____

[2]As discussed *infra*, in Ground One, Petitioner raises an additional sufficiency of the evidence claim not raised on direct appeal to the OCCA.

whether the state court decision is either contrary to or an unreasonable application of that law. *Id.* at 1018.

A state court decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different," "opposite in character or nature," or "mutually opposed" to the Supreme Court decision itself. *Id.* at 406. A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "AEDPA's conception of objective unreasonableness lies 'somewhere between *clearly* erroneous and unreasonable to all reasonable jurists.'" *House*, 527 F.3d at 1019 (*quoting Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)). "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.'" *Id.* (*quoting Maynard*, 468 F.3d at 671)). As the Supreme Court recently emphasized, "AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 130 S.Ct.1855, 1866 (2010).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Moreover, factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

## V.    Analysis

### A.    Ground One – Sufficiency of the Evidence

#### 1.    Reliability of Testimony of State's Witness J.D.

In her first ground for relief, Petitioner claims the evidence was insufficient to support the conviction for Murder in the First Degree. Before proceeding with an analysis of this claim, the Court first notes that Petitioner has raised an additional basis for this claim that was not raised before the OCCA. Petitioner now claims as part of her sufficiency of the evidence challenge that "the OCCA relied upon uncorroborated and tainted facts that Petitioner had committed the crime of murder in the first degree." *See* Petition at 5. In her Brief in Support [Doc. #2], Petitioner elaborates upon this claim and challenges the reliability of the testimony of State's witness, J.D., the younger brother of the victim, who was nine years old at the time of the trial and four years old at the time of the crime. This basis for her sufficiency of the evidence claim was not raised on direct appeal to the OCCA and, therefore, is unexhausted. Respondent has not addressed this aspect of Petitioner's sufficiency of the evidence challenge.

The presence of an unexhausted claim renders the habeas petition a "mixed petition," that is, one containing both exhausted and unexhausted claims. *See Rose v. Lundy*, 455 U.S. 509, 510 (1982). Federal courts may dismiss mixed petitions to allow the petitioner to return to state court to pursue state court remedies, *id*. at 510, or they may reach the merits to deny the unexhausted claim, *Brown v. Shanks*, 185 F.3d 1122, 1125 (10th Cir.1999). *See also* 28 U.S.C. 2254(b)(2) (allowing a federal district court to deny, but not grant, unexhausted habeas claims, as an alternative to the dismissal of a mixed petition).

Petitioner's constitutional challenge to the sufficiency of the evidence based on her assertion that J.D.'s testimony was not reliable is without merit. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction [is] . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 307, 318 (1979). In conducting this inquiry, the court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id*. at 318-319 (citation omitted). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (citation omitted). As the Supreme Court has explained, "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. On review, this evidence must be

considered in the light most favorable to the prosecution so as to preserve the factfinder's role as weigher of the evidence. *Id.*

Petitioner's challenge goes directly to the credibility of J.D.'s testimony. Significantly, the defense called an expert witness, Bart Trentham, Ph.D., to provide an opinion about the reliability of child testimony, specifically, child testimony given as part of a forensic interview. *See* Record [Doc. #13], Transcript of Trial Proceedings (Tr.), Vol. VIII at 1906-1945. Thus, the jury was informed as to the potential for suggestibility of a child witness in the context of a forensic interview. It was for the jury, as trier of fact, to assess the proper weight and credibility to be afforded the testimony of J.D. *Compare Parker v. Scott*, 394 F.3d 1302, 1315 (10th Cir. 2005) (addressing child victim testimony in sexual abuse case and stating: "it is axiomatic that the responsibility of adjudging the child's credibility belonged to the trier of fact, not to [the Court]") (*citing Jackson*, 443 U.S. at 1319)). [3]

Here, as in *Parker*, whether to discount J.D.'s testimony as unreliable was an issue for the trier of fact and not subject to review by this Court. Accordingly, Petitioner's challenge

---

[3] As the Court further stated in *Parker*:

> To the extent Parker claims that the child gave inconsistent statements at trial and in the other interviews, his counsel had the opportunity to cross-examine the child and the other witnesses to expose the alleged inconsistencies. . . .The jury was in a position to credit or discount the child's testimony and weigh the inconsistencies in light of her age and the passage of time. Parker's claims about inconsistency are primarily based on the jury's acceptance of his and the other defense witnesses' testimony over the child's. That determination, however, is distinctly within the realm of the jury, which we cannot enter on AEDPA review.

*Id.* at 1315.

to the sufficiency of the evidence, premised on the alleged lack of reliability of the testimony of J.D., is without merit and should be denied.

>   **2.      Sufficiency of the Evidence to Support the Element of the
>           Offense of Murder in the First Degree Requiring Proof of
>           Use of Unreasonable Force**.

The Court now turns to Petitioner's sufficiency of the evidence claim, as raised both on direct appeal and in this habeas action, that the State failed to prove an essential element of Murder in the First Degree.  As set forth in the OCCA's opinion, the jury was instructed that it had to find the following elements beyond a reasonable doubt:

> *First*, the death of a child under the age of eighteen;
>
> *Second*, the death resulted from the willful or malicious using of unreasonable force;
>
> *Third*, by the defendant.

*See Rutan*, 202 P.3d at 849 (*citing* OUJI-CR-2d 4-65(A)). Petitioner specifically claims the State failed to prove the second element of the crime, that Petitioner used unreasonable force.

Rejecting the claim on the merits, the OCCA applied the proper standard governing sufficiency of the evidence challenges as set forth in *Jackson*.  *See Rutan*, 202 P.3d at 849 ("When reviewing challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.") (*citing Easlick v. State*, 90 P.3d 556, 559 (Okla. Crim. App. 2004); *Spuehler v. State*, 709 P.2d 202,

203-204 (Okla. Crim. App. 1985)).[4]  Therefore,  Petitioner is entitled to relief only if the OCCA's rejection of her sufficiency of the evidence argument on direct appeal of her conviction was contrary to or an unreasonable application of *Jackson*.

Addressing this claim on direct appeal, the OCCA first noted that under Oklahoma law, and as the jury was instructed, the term "unreasonable force" means "[m]ore than that ordinarily used as a means of discipline."  *See Rutan*, 202 P.3d at 849 (citations omitted). The OCCA then made the following findings:

> The evidence immediately surrounding the commission of the crime is sufficient to show that Appellant used unreasonable force which resulted in the death of the victim. At 3:00 a.m. Logan screamed loud enough to wake up Melody Lennington. Logan was never seen or heard from again. Appellant told Lennington she put her "sick" child in the barren basement. In addition to falsely telling those around her that DHS had come and picked up Logan, she felt the need to explain a bruise on her arm, which she attributed to Logan. The wad of tape found in the basement contained mainly scalp hair from the victim, but one to two hairs appeared to be from an eyebrow. Appellant explained that the wad of tape was left from a time when Logan, J.D., and other children were putting tape all over themselves during a tornado warning. However, testimony from witnesses present in the basement at that time directly refuted Appellant's claim that the children played in the basement and that there was tape in the basement. Lennington testified she kept neither tape nor candles in the basement. Appellant admitted she had spilled candle wax on her shirt.
>
> ¶ 53 Appellant contends that J.D.'s statements concerning Appellant putting food in Logan's mouth and tape over his eyes and mouth do not support a finding that Logan was fatally taped in the basement. Appellant asserts the

[4]Although the OCCA cited its own precedent in support of this standard, and not *Jackson*, as the Tenth Circuit has found, the OCCA's precedent comports with the *Jackson* standard. *See Torres v. Mullin*, 317 F.3d 1145, 1152 n. 3 ("Even though the OCCA did not cite *Jackson*, we note, as does the respondent, that Oklahoma has adopted the *Jackson* standard for assessing the sufficiency of the evidence.") (citations omitted).

only logical inference is that Logan was already dead or extremely ill when J.D. purportedly observed Appellant put the tape on him.

¶ 54 From the record before us, we do not know exactly what happened to Logan Tucker early that Sunday morning. We do not know whether he was alive at the time he was taken to the basement and died thereafter or whether he was already dead when he was placed in the basement. However, we do know that Appellant was his primary caregiver and the last adult to ever see him alive. We do know that at some point in time she put tape over his mouth and eyes and thereafter he neither moved nor made any sounds. We do know that she drove the lifeless little boy around in an apparent attempt to dispose of him. Based upon this evidence, the jury could logically infer that Appellant maliciously used force on Logan beyond that ordinarily used as a means of discipline and that such unreasonable force caused his death.

¶ 55 Additionally, evidence of the history of verbal and physical abuse inflicted upon the victim by Appellant supports a finding that she used unreasonable force on Logan which resulted in his death. *See Rawlings v. State*, 1987 OK CR 135, 740 P.2d 153 (a first degree murder case where the victim's body was never found and this Court determined the defendant's history of threats and physical abuse inflicted on the victim supported the finding that the victim died as a result of the criminal acts of the defendant). When considered in its entirety, the evidence shows that Appellant did everything she could to rid herself of the burden of raising Logan, who she considered a mistake and an obstacle to having the life she felt she deserved. When she was unable to have him arrested, taken into state custody, placed in a mental hospital or given to her parents, she resorted to her expressed wish to kill her child and get away with it.

¶ 56 Appellant claims that unlike in other murder prosecutions, in child abuse murder cases, the State must prove the cause of the victim's death. In support, Appellant directs our attention to language in the statute which requires "that the harm to the child, either injury or the use of unreasonable force, be the cause of death." See 21 O.S.2001, § 701.7(C). Appellant asserts that "the mere fact that an unreasonable force preceded a death of a child is not sufficient for a conviction." Appellant argues that under this statutory language, "proof of some specific act is required because, much like a typical felony-murder charge, the act replaces the mens rea." In support, Appellant relies on *Gilson v. State*, 2000 OK CR 14, 8 P.3d 883, which she asserts "analogiz[ed] child abuse murder ... to felony murder."

¶ 57 Appellant's reliance on *Gilson* is misplaced. In *Gilson*, we compared §
701.7(C) child abuse murder to § 701.7(B) felony murder, only in so far as
both provisions set out alternate ways of committing the crime. Under
Oklahoma law, all manner of first degree murder requires that the defendant's
actions cause the victim's death for a finding of guilt. See 21 O.S.2001,
§§ 701.7(A)-(E). To accept Appellant's argument that a specific cause of death
must be proven in this case would allow Appellant to literally get away with
murder because she successfully disposed of the body. Contrary to Appellant's
argument, "a body need not be found in order for the crime of murder to be
proven." *Arnold v. State*, 1990 OK CR 78, ¶ 13, 803 P.2d 1145, 1148. In the
present case, the State was required to prove that Appellant caused the victim's
death by the unlawful, willful, and malicious use of unreasonable force. *See
Revilla v. State*, 1994 OK CR 24, ¶ 11, 877 P.2d 1143, 1148 ("the State was
not required to prove the element of intent to kill, but was required to prove
that Appellant 'willfully' or 'maliciously' injured, tortured, maimed or used
unreasonable force upon the victim"). Based upon the evidence in this case,
there can be no other conclusion than that Appellant used unreasonable force
on the victim which resulted in his death. This assignment of error is denied.

*See Rutan*, 202 P.2d at 849-850.

As Respondent correctly contends, the OCCA's specific findings of fact are presumed

correct, and Petitioner has failed to overcome the presumption with clear and convincing

evidence. 28 U.S.C. § 2254(e)(1). Further, with the proper AEDPA standards in mind, this

Court has reviewed the entire record. Based on that review, the Court finds that the OCCA's

well-reasoned and amply supported determination of the issue is not contrary to or an

unreasonable application of *Jackson*, nor does it involve an unreasonable determination of

the facts in light of the evidence presented. The record evidence, viewed in the light most

favorable to the prosecution, reasonably supports a finding of each essential element of the

crime beyond a reasonable doubt. Ground One of the Petition, therefore, should be denied.

**B.**     **Ground Two – Right to Counsel of Choice**

In her second ground for relief, Petitioner claims she was denied her Sixth Amendment right to counsel of her choice.

The record establishes that Petitioner retained private counsel, David Christian, to represent her. On May 11, 2006 (approximately one year prior to trial), the State moved to disqualify Christian from representing Petitioner. *See* Response, Exhibit 5, Motion to Compel Defense Counsel to be Disqualified by the Court and Ordered to Withdraw. Following a two-day evidentiary hearing, the trial court granted the State's motion. The trial court then appointed different counsel to represent Petitioner.

On direct appeal of her conviction, Petitioner claimed that as a result of the trial court's action, she was denied her federal constitutional right to counsel of her choice. The OCCA rejected the claim. In support of its determination, the OCCA recited the following facts from the record:

> The record reflects that on May 11, 2006, the State moved to disqualify David Christian from representing Appellant on the basis of an inappropriate physical relationship between Mr. Christian and Appellant; the existence of a conflict of interest between Mr. Christian and Appellant resulting from the physical relationship as well as statements made by Appellant to an undercover officer; an improper fee arrangement and improper financial payment; possession of relevant evidence in the form of a book bag belonging to Logan Tucker; and the appearance of impropriety. These reasons were set forth in detail in the State's Memorandum of Law (O.R.147-154).
>
> ¶ 59 Mr. Christian filed an objection and attached two sworn affidavits, one from him and one from Appellant. In her affidavit, Appellant listed the statements attributed to her by the State and said that "none of the statements were true." She further stated, "[a]t the time the statements were made, I was not aware that the person asking me questions was a law enforcement agent.

At no time did he ever identify himself as a law enforcement agent."
(Defendant's Exhibit A). Appellant also stated that Mr. Christian had fully
explained to her that if she felt any of the things said in the State's recording
were true, that she could file a report against him with the Oklahoma Bar
Association, and she could have another attorney represent her in the case. In
his affidavit, Mr. Christian also refuted and denied the State's allegations of
any conflict or impropriety.

¶ 60 At the hearing, the parties stipulated that Mr. Christian paid the rent for
Appellant's motel from July 9-15, 2002 (State's Exhibit 1), and that he paid for
and was listed as a co-applicant with Appellant for an apartment (State's
Exhibit 2). State's Exhibit 2 also contained a lease agreement for Apartment
No. 52, dated July 15, 2002, listing Mr. Christian and Appellant as co-tenants.
Mr. Christian also stipulated that if called to testify, Jamie Hensal would
testify that in the summer of 2004 she found a backpack in Mr. Christian's
garage and was told by Mr. Christian that he knew it was there, and she should
put it somewhere so he could find it later if needed. The State alleged the
backpack belonged to Logan Tucker and that his name was written on it. Mr.
Christian would not stipulate to having any knowledge the backpack belonged
to Logan.

¶ 61 The State then called Investigator Rick Stephens to the stand. Stephens
testified that in his capacity as an undercover officer, he moved into an
apartment on July 20, 2002, directly across from Appellant's apartment in the
Briarwood Complex in Woodward. Stephens met Appellant the next weekend
and over the next six weeks, the two had numerous conversations. Stephens
tape-recorded these conversations. During these tape recorded conversations,
Appellant told Stephens that a movie was going to be made on Logan's story
and that Mr. Christian would be paid from the proceeds of the movie.
Appellant also told Stephens that prior to the time they met, she had "made
out" with Christian in a motel room. She said Christian told her he "wanted to
have sex with her but he wouldn't because of her status." She said that at the
time the police were executing a search warrant on her home, she and
Christian were drinking at the City Limits bar. Appellant told Stephens she felt
that Mr. Christian did not trust her and that he was tape recording her
statements. She explained that she didn't know who to trust, that she couldn't
even trust her attorney. Stephens testified that he turned the tape recordings

over to the District Attorney. Stephens also testified that Appellant did not know he was with law enforcement and he never took her drinking or gave her alcohol. The tape recordings were admitted as State's Exhibits 4 and 5.

*Rutan*, 202 P.3d at 850-851.

The OCCA then applied a "clearly erroneous" standard of review as to the trial court's resolution of the facts underlying Petitioner's right to counsel claim. *See id*. at 852. The OCCA determined that "the State's evidence if believed, and even when weighed against counsel's denials, is sufficient to find that a conflict existed sufficient to warrant disqualification of counsel." *Id*. at 853.[5]

Petitioner does not rebut the findings of the state courts by clear and convincing evidence. Accordingly, those factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1).

---

[5]In support of its finding, the OCCA cited Rules 1.8(d), (e), and (j) of the Oklahoma Rules of Professional Conduct, Okla. Stat. tit. 5, Ch. 1, App. 3-A. As the OCCA stated:

Rule 1.8(d) provides that prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on the information relating to representation. Rule 1.8(e) provides that a lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except for a lawyer may advance court costs and expenses of litigation and a lawyer who represents an indigent client may pay court cost and expenses of litigation on behalf of the client. Rule 1.8(j) prohibits a sexual relationship between a lawyer and a client unless 1) a consensual sexual relationship existed between them when the client-lawyer relationship commenced, and 2) the relationship does not result in a violation of Rule 1.7(a)(2).

*Id*., 202 P.3d at 853 n. 6.

Nor has Petitioner demonstrated that the OCCA's ultimate determination that Petitioner was not denied her constitutional right to counsel of her choice is contrary to or an unreasonable determination of clearly established federal law.

The Sixth Amendment right to the assistance of counsel includes "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). If the "right to be assisted by counsel of one's choice is wrongly denied . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id*. at 148.

This right to counsel of choice, however, "'is circumscribed in several important respects.'" *Id*. at 144 (*quoting Wheat v. United States*, 486 U.S. 153, 159 (1988)). A defendant may not "demand that a court honor his waiver of conflict-free representation." *Id*. at 151-152 *citing Wheat*, 486 U.S. at 159-160. And, a trial court is given "wide latitude in balancing the right to counsel of choice against the needs of fairness . . . ." *Id*. at 152. In addition, the court has "'an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear to be fair to all who observe them.'" *Id*. (*quoting Wheat*, 486 U.S. at 160).

In rejecting Petitioner's claim on direct appeal, the OCCA relied upon relevant Supreme Court precedent and concluded:

In the present case, the trial court was faced with numerous conflicts which had the potential to adversely affect Mr. Christian's representation of Appellant. The record before us shows that Mr. Christian was put in the position of defending his credibility at his client's expense in the face of evidence that he agreed to split the movie rights with her, that he paid for her living expenses, that he "made out" with her and wanted to have sex with her and that he didn't believe her stories about the disappearance of her son. In this situation, "no rational defendant would knowingly and intelligently desire" that Mr. Christian continue his representation.

¶ 72 On the record before us, the presumption in favor of the defendant's right to counsel of choice was overcome "by a showing of a serious potential for conflict." Therefore, the trial court properly disqualified Mr. Christian from representing Appellant and this assignment of error is denied.

*See Rutan*, 202 P.3d at 853-854. As the OCCA found, the trial court's determination that Mr.

Christian should be disqualified from representing Petitioner is supported by the factual

record and Petitioner has not rebutted this factual record with any evidence, much less clear

and convincing evidence. The trial court exercised proper discretion in removing Mr.

Christian and, in doing so, protected the court's independent interest in ensuring that the

criminal trial was conducted fairly and within the ethical standards of the profession. The

OCCA's determination of this issue is not contrary to or an unreasonable application of

clearly established federal law. Ground Two of the Petition, therefore, should be denied.

## C. <u>Ground Three – Other Crimes Evidence</u>

As her third ground for relief, Petitioner claims the trial court erroneously allowed

admission of other bad acts evidence in violation of her federal due process rights.

Specifically, Petitioner challenges the admission of evidence related to her "numerous failed

relationships with different men and her participation in a topless contest at a motorcycle

rally the weekend after the child victim disappeared." *See* Petitioner's Brief in Support at

8. Petitioner also claims the trial court erred by not giving a limiting instruction to the jury

regarding the evidence of prior bad acts.

Petitioner raised this claim on direct appeal of her conviction. She provided greater

detail on direct appeal about the specific evidence challenged. The OCCA summarized that

evidence as follows:

> In her third assignment of error, Appellant argues that the trial court erred in
> admitting irrelevant and prejudicial evidence of other bad acts which amounted
> to nothing more than "character assassination." Specifically, she complains
> about testimony from Delbert and Faye Randell, that while visiting in the
> Randell home, Appellant flirted with Mr. Randell whenever his wife left the
> room, that within a week or two of the break up of Appellant's marriage, she
> began living with a man she had just met, and that following the breakup of
> that relationship, Appellant moved to a low-income apartment and began
> posting on internet dating sites that she was looking "for one night stands;"
> State's Exhibit 1, an internet personals ad submitted by Appellant which
> included responses by Appellant that she did not have any children and she
> was not sure if she wanted any; testimony from Michael Pettey that his
> relationship with Appellant "got physical" on the first weekend they met face
> to face; e-mails between Appellant and Pettey showing the relationship was
> becoming more serious to Appellant than to Pettey and references to particular
> sexual activity they were going to engage in when they were next together;
> testimony regarding Appellant accompanying Pettey to a biker rally the first
> weekend after Logan disappeared and her participation in a topless contest;
> and admission of photographs from the rally and the contest. Appellant also
> complains about testimony from co-worker Jamie Adams, that after Logan's
> disappearance, Appellant said she had only one son who was 4 years old and
> that Appellant told her about entering the topless contest and why she didn't
> win.

*See Rutan*, 202 P.3d at 854; *see also* Response, Exhibit 1, Brief of Appellant at 33-44.

The OCCA rejected this claim finding, as a matter of state law, the other bad acts

evidence was admissible to show motive, opportunity, intent, preparation, plan, knowledge,

identity or absence of mistake or accident. *Rutan*, 202 P.3d at 854. In support of this

finding, the OCCA stated:

> As Appellant correctly notes, the State's theory in this case was that she killed Logan so she could finally lead the life she wanted to lead, free from the responsibilities of caring for him. Appellant even acknowledges that evidence of her prior treatment of Logan, particularly when compared with that of J.D., her stated feelings toward him and her desires to hurt and kill him were relevant to show her motive and intent on June 23, 2002. However, contrary to Appellant's assertions, it was entirely appropriate for the jury to hear evidence of her string of failed relationships with men and her placing the blame for those failed relationships on Logan's behavior and personality, her increasing determination not to let Logan ruin another relationship, and her complete lack of remorse and concern for her missing son when she was finally able to do what she wanted and go to the biker rally the first weekend after his disappearance. This evidence was highly relevant to show her motive and intent. *See Andrew v. State*, 2007 OK CR 23, ¶¶ 49-53, 164 P.3d 176, 191-192 (evidence of defendant's sexual affairs which had ended prior to the murder of her husband was relevant to show her motive and intent).

*See Rutan*, 202 P.3d at 855.

The OCCA then considered whether, though admissible as relevant, the evidence

should have been excluded as unduly prejudicial. The OCCA found:

> Some of the prior bad acts evidence admitted in this case carried a great risk of prejudice. [6] However, a review of the record shows that in light of evidence of Appellant's own statements to numerous people that she blamed Logan for the failure of her relationships, her varied and inconsistent statements regarding his whereabouts after June 23, 2002, and her conduct during the days following his disappearance, *any error in admitting the bad acts evidence was harmless beyond a reasonable doubt*. The trial court did not abuse its discretion in admitting the complained of evidence.

---

[6]The OCCA did not identify the particular evidence that "carried a great risk of prejudice."

*See Rutan*, 202 P.3d at 855 (citation omitted) (emphasis added). The OCCA also rejected Petitioner's claim that she was prejudiced as a result of the trial court's failure to issue a limiting instruction to the jury on the use of prior bad acts evidence. The OCCA found: "[s]uch an instruction was never requested by Appellant, and based upon the record in this case, we find no plain error in the omission of such an instruction." *Id*. at 855 (citation omitted).

The clearly established federal law governing habeas review of admission of other crimes evidence is found in the Due Process Clause of the Fourteenth Amendment which provides a mechanism for relief "when 'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair.'" *Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006), *abrogated on other grounds in Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009) (*quoting Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). *See also Hopkinson v. Shillinger*, 866 F.2d 1185, 1197 (10th Cir.1989) (on habeas review, a state court's admission of evidence of other crimes does not warrant habeas relief unless "the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies the defendant due process of law"). As the Tenth Circuit has observed, "[t]he OCCA has repeatedly allowed the admission of evidence of other crimes to prove motive, common scheme, identity, plan, knowledge, or absence of mistake or accident." *Hale v. Gibson*, 227 F.3d 1298, 1321 (10th Cir. 2000) (*citing Huskey v. State,* 989 P.2d 1, 3 (Okla.Crim.App.1999); *Douglas v. State*, 951 P.2d 651, 673 (Okla.Crim.App.1997)). Here, as the OCCA determined, the evidence was relevant to show Petitioner's motive and lack of

remorse and, therefore, its admission did not constitute a violation of Petitioner's due process rights.

To the extent the evidence "carried a great risk of prejudice," Petitioner has not shown the admission of the evidence had a substantial and injurious effect on the jury's verdict as required by the standards set forth in *Brecht v. Abrahamson*, 507 U.S. 619(1993), and *O'Neal v. McAninch*, 513 U.S. 432 (1995). *See Fry v. Pliler*, 551 U.S. 112, 120, 121 n. 3 (2007).[7]

Nor has Petitioner shown a right to federal habeas relief based on the trial court's failure to give the jury a limiting instruction with respect to the other bad acts evidence. The Supreme Court has stated that, with respect to alleged errors in jury instructions, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "Habeas proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the error had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense." *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir.1990). The petitioner who attacks a state conviction on the basis of the jury instructions "has a great burden." *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir.1995). Moreover, as a petitioner attacking a state court judgment based on a refusal to give a requested jury instruction, the burden on Petitioner is especially great. *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th

---

[7]On habeas review, this standard applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1967)]." *Fry*, 551 U.S. at 121-122.

Cir.1999). This is because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* (internal quotations omitted) (*quoting Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

Here, Petitioner fails to demonstrate that the failure to give a limiting instruction regarding the other bad acts evidence denied her a fundamentally fair trial. And the fact that, as a matter of state law as determined by the OCCA, the evidence was admitted for a proper purpose further undermines any error in not giving a limiting instruction.

In sum, the OCCA's determination of the issues raised in Ground Three of the Petition is not contrary to or an unreasonable application of clearly established federal law, nor is it an unreasonable determination of the facts in light of the evidence presented. Ground Three of the Petition, therefore, should be denied.

### D. Ineffective Assistance of Trial Counsel

As her fourth and final ground for relief, Petitioner claims she was denied the Sixth Amendment right to the effective assistance of counsel at trial. She claims, as she did on direct appeal, that her trial counsel was ineffective due to his failure to object to the admission of other bad acts evidence, discussed *supra*.[8]

---

[8]On direct appeal, Petitioner further claimed trial counsel was ineffective for failing to timely appeal the trial court's decision to disqualify Mr. Christian from representing her by seeking extraordinary relief before the OCCA. *See* Response, Exhibit 1, Brief of Appellant at 45. Petitioner does not assert that claim in this habeas action. Even if she were to raise such a claim, it would be without merit. The OCCA expressly found on direct appeal: "[T]he trial court's ruling on disqualification was proper. Even if an appeal had been filed it would have been denied by this Court. Therefore, Appellant is unable to show that she was prejudiced by the absence of an appeal and her claim of ineffectiveness in this regard is denied." *Rutan*, 202 P.3d at 856.

In reviewing Petitioner's ineffective assistance of trial counsel claims, the OCCA applied the familiar standards of *Strickland v. Washington*, 466 U.S. 668 (1984), and determined that Petitioner's trial counsel did not render ineffective assistance. *See Rutan*, 202 P.3d at 855-856. Therefore, to establish a right to federal habeas relief, Petitioner must demonstrate the OCCA's determination of her ineffective assistance of counsel claim is contrary to or an unreasonable application of *Strickland*.

Pursuant to *Strickland*, the Court must determine whether counsel's performance was constitutionally deficient, and whether the deficient performance prejudiced the defense, depriving Petitioner of a fair proceeding with a reliable result. *Strickland*, 466 U.S. at 687; s*ee also Snow v. Sirmons*, 474 F.3d 693, 719 (10th Cir. 2007). Under the deficient performance prong, Petitioner must show that his counsel's performance "fell below an objective standard of reasonableness" in that it was outside "the range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687-88. Under the prejudice prong, Petitioner must show that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Id*. 466 U.S. at 694. That is, Petitioner must show "counsel's errors were so serious as to deprive [her] of a fair trial, a trial whose result is reliable." *Id*. at 687. "Establishing a reasonable probability of a different outcome requires something less than a showing 'counsel's deficient conduct more likely than not altered the outcome in the case.'" *Hooks v. Workman*, 606 F.3d 715, 724 (10th Cir. 2010) (*citing Strickland*, 466 U.S. at 693). "Instead, a reasonable probability is one

'sufficient to undermine confidence in the outcome.'" *Hooks* at 724 *quoting Strickland* 466

U.S. at 694.[9]

As discussed in relation to Petitioner's Ground Three, the other bad acts evidence was

properly admitted as a matter of state law. Although, as the OCCA acknowledged, some of

---

[9]In her Brief in Support [Doc. #2] Petitioner appears to argue that her ineffective assistance of trial counsel claim should be governed by *United States v. Cronic*, 466 U.S. 648 (1984) and not *Strickland*. Although not entirely clear, Petitioner appears to contend that counsel's failure to object to the other bad acts evidence constitutes a failure to "subject the prosecution's case to meaningful adversarial testing" and, therefore, that prejudice should be presumed without the showing of prejudice that is otherwise required by *Strickland*. *See Cronic*, 466 U.S. at 654; *Strickland*, 466 U.S. at 692. Petitioner further claims the right to a presumption of prejudice based on the allegation that "a possible conflict of interest" existed between her court-appointed trial counsel and her appellate counsel because "both trial and appellate were from the same office branch." *See* Brief in Support at 12. In addition, she claims, in conclusory fashion and without elaboration, that her court appointed counsel was "forced upon her" and, therefore, an actual conflict existed.

On direct appeal, Petitioner's ineffective assistance of counsel claim was limited to counsel's failure to object to the admission of other bad acts evidence or to request a limiting instruction for the jury. *See* Response, Exhibit 1, Brief of Appellant at 44-45. To the extent Petitioner now attempts to raise a claim of ineffective assistance of counsel different from the claim raised on direct appeal, any such claim would be unexhausted. But such a claim is also without merit. Petitioner has not shown that she is entitled to a presumption of prejudice. Her claim of ineffective assistance of trial counsel relates to counsel's failure to object to the admission of other bad acts evidence. Her claim is not a claim that counsel failed to oppose the prosecution through the trial as a whole, but failed to do so at specific points. Accordingly, her attorney's alleged errors are subject to analysis under *Strickland*, not *Cronic*. *See Bell v. Cone*, 535 U.S. 685, 697 (2002) (holding that *Strickland*, not *Cronic*, applied where defendant challenged counsel's failure to adduce mitigating evidence and his waiver of closing argument because such challenges did not demonstrate that attorney "*entirely* fail[ed] to subject the prosecution's case to meaningful adversarial testing . . . but that his counsel failed to do so at specific points."(internal quotations and citation omitted)). As discussed *infra*, Petitioner has failed to show prejudice as a result of counsel's failure to object to the admission of other bad acts evidence. And, Petitioner's claim of an actual conflict is based on mere speculation, without factual support. Indeed, in framing her claim, Petitioner herself states only that a "possible" conflict existed. Thus, to the extent Petitioner raises unexhausted additional claims of ineffective assistance of counsel, those claims are without merit and should be denied. *See* 28 U.S.C. § 2254(b)(3).

Moreover, as to the ineffective assistance of trial counsel claim addressed on the merits by the OCCA, for the reasons discussed, that claim is governed by *Strickland*, not *Cronic*, and the OCCA was correct to apply *Strickland* to Petitioner's claim.

the evidence was certainly prejudicial, Petitioner has not shown that the evidence was wrongfully admitted. Nor has Petitioner demonstrated that had counsel objected to the evidence a reasonable probability exists that the result of the proceedings would have been different. As the OCCA concluded, Petitioner "has failed to show that any errors by counsel were so great as to render the results of the trial unreliable." *Rutan*, 202 P.3d at 856. Because the admission of the evidence was proper as a matter of state law, the OCCA found neither deficient performance nor prejudice. The OCCA's adjudication of the issue is not contrary to or an unreasonable application of *Strickland*.

## RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus [Doc. #1] be denied.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Any objections must be filed with the Clerk of the District Court by December __1st__, 2010. *See* Local Civil Rule 72.1. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation disposes of all matters referred by the District Judge in this case and terminates the referral.

DATED this __10th__ day of November, 2010.

VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE